May it please the Court, good morning. Brent Cohen appearing on behalf of Appellant Sinclair Oil Corporation. With the Court's permission, I'd like to reserve ten minutes of my time for rebuttal. Good luck. The District Court erred in granting summary judgment against Sinclair. Summary judgment was based on the release approved as part of the NYMEX Class Action Settlement and the District Court's determination of the existence of an identical factual predicate between the NYMEX case and Sinclair's. There is no identical factual predicate. The NYMEX claims arose exclusively from and were limited to the manipulation of natural gas futures and options contracts traded on the NYMEX. This is contrasted. Well, couldn't a release, let's assume that I've been sued by a competitor in some sort of business relationship, and I say to the competitor, I'm willing to settle this, but I want to make sure you don't have any other claims against me. So I'm only willing to pay you for this one if you release any claims you may have against me, any and all claims, a general release. A release could do that, could it not? I think a release could do that, Your Honor. Why didn't a release in this case do that? Without an identical factual predicate, it cannot. No, no, I'm not. Nessie, now you're telling me I can't. In other words, let's assume there's a lawsuit against me for trademark infringement by one of my competitors, and I say I'm willing to settle this case, but only if you give me a total and complete release of any other claims you might have against me without regard to their factual predicate. We can get to a moment of what this release actually says. I'm just asking you a hypothetical. I don't understand why under that circumstance we need to have an identical factual predicate. Do we? I think that the reason that you need to have an identical factual predicate is because Hesse v. Sprint Corp. tells you that you must. That is the precedent in the circuit. I'm asking you whether that precedent really means that I can't seek a general release from somebody once he begins litigation against me. Is there a different rule for class actions than there is for individual litigation? Is that what you're saying? I believe that there is, Your Honor. But we've only seen this issue addressed in the context of class action cases. Yeah, and it may well be that in class action cases a general release is not appropriate. But that's what I'm trying to focus on. Is your argument a class action argument? I think that under these circumstances, in a class action setting, the release without an identical factual predicate is not operative. Now, you make in this case two sort of conflicting arguments. One, in your motion for summary reversal, where you say we ought to rely on the farmland case and find that there wasn't an identical factual predicate, whether it's law of the case or precedent or whatever, and therefore you should win. In your papers, you say the release doesn't even cover this because, contrary to farmland, the release, you say, doesn't release anything except claims that arise out of natural future contracts. You're entitled to take inconsistent positions, but which is your better one? I don't see those as inconsistent at all, Your Honor. Well, farmland says the release covers this facially, but it's not the same transaction. Your briefs say it doesn't cover it facially. That seems to be inconsistent to me. Farmland applied the release to farmland by virtue of the fact that it was hedging its physical purchases. No, no, to be fair. So to be fair, what the farmland panel said was that release on its face is broad enough to cover your direct purchase claims. Did it not? I disagree, Your Honor. You don't think that's what it said? I interpret that to agree. Why then wouldn't it have just said the release doesn't cover this? I mean, I know it's a non-precedential decision, but it seems to me a whole bunch of useless analysis if the court really thought the release didn't cover the claims at all. As I read the farmland opinion, Your Honor, it's specific to the fact that farmland was hedging its transactions on the NYMEX. And in this case, the record is clear. Sinclair's physical purchases were not hedged on the NYMEX. And that's the difference. Even so, to apply that release – Get away from inconsistencies for a second and just go to the release. Do you think the release on its face covers your claims? Certainly not, and I'll tell you why. There are two phrases in that release that are critical to this. The first restricting the release to transactions traded on the NYMEX. Our transactions were not traded on the NYMEX. There's another point that you should pay attention to, and this wasn't addressed in the farmland decision. If you look at the parenthetical language that follows that broad language that is arising from or relating in any way to trading in NYMEX natural gas transactions, you'll see PEREM including taking or making delivery of physical natural gas pursuant to any NYMEX natural gas contract. I understand that argument, and I think it has some purchase. Here's why I asked the previous question. You said, look at farmland. That demands summary reversal. Now you're telling me farmland isn't the same case. So it would only demand summary reversal if it were the same case. And if it were the same case, then it would mean that the release applied to your claims, would it not? Broadly speaking, Your Honor, there were three grounds for reversal stated in our briefs. The interpretation of the release, the identical factual predicate issue, and the due process issues. I think that what the Court is asking is whether the Court's interpretation of the release and the identical factual predicate issue are somehow mutually exclusive. And, again, I come back to the fact that I read farmland to apply the release in that situation because the transactions, the specific transactions that were part of the farmland claim were being hedged on the NYMEX. So basically, if I understand your argument, it is the release doesn't cover our claims. If you disagree, we still win because there's not an identical factual predicate in the context of the class action. That's exactly right, Your Honor. And, again, because of the fact that these were not NYMEX, traded under NYMEX contracts, correct? That is correct. But doesn't the release also refer to, under Part C, I'm looking at ER 589, it says it also covers claims that may arise under or relate to any federal or state commodity price manipulation. Isn't that what you're claiming here, a commodity price manipulation? Not necessarily in connection with a direct NYMEX contract, but still, you're making allegations that they manipulated the market through these false representations that inflated the prices of the commodity, right?  So that's not the broad type of language that Judge Hurwitz was talking about earlier that would perhaps be covering this claim? I think that that language is qualified by the language trading in NYMEX natural gas contracts. And back to the parenthetical, in order to interpret the release, to cover Sinclair's claims, you have to read that language about physical natural gas pursuant to any NYMEX natural gas contract. You have to read that out of the release altogether. And I think that applicable release interpretation law, which is New York in this case, prohibits us from doing that. Did you wish to save now down to six minutes for rebuttal? If I may, I'll reserve the rest for rebuttal. Thank you very much. May it please the Court. John Ruleford, defendant, Appalee One Oak Energy Services Company. The judgment should be affirmed based on res judicata because the physical purchase claims that Sinclair is making in this case arise out of the same transaction. But doesn't the case law say that when a judgment is based on a settlement agreement, the res judicata effect of the judgment is constrained by the settlement agreement? I don't believe that's correct, Your Honor. You think the courts that have said that, including us, were wrong? Well, I think what happened in this case, if we go back to the NYMEX case, the defendants paid $100 million for two things. One, a release, and secondly, a dismissal with prejudice of the claims that were asserted in those cases. The release language the parties agreed upon, but as we've seen in Farmland and in this case, how that release applies has become the matter of some controversy. Right. But I want to understand your position. Let's assume you have a settlement agreement that says we're releasing claim X but not claim Y, and that settlement agreement is approved by a court and incorporated into a judgment. Your position is that that settlement agreement is claim preclusive as to claim Y? No, Your Honor. I wouldn't be saying that, but that's not what we have here. Well, now let's assume we have a settlement agreement that says I release claim X and is silent on claim Y. Correct. Your position is it's claim preclusive on claim Y? With one additional fillip here. The settlement agreement also required that the plaintiffs dismiss with prejudice the claims that they had asserted in the case, which means that they were dismissing not only claims that were asserted in that case, but claims which arose out of the same trans- Well, see, but my problem with that is that you're ignoring the settlement agreement. So my question is what's the effect of a settlement agreement when the dismissal of the claims is made pursuant to the agreement? And, you know, we've got a whole bunch of cases, and other circuits do, too. The Eleventh Circuit said it better than us. A settlement agreement entered into the context of a voluntary dismissal with prejudice under Rule 41 should be interpreted according to its expressed terms rather than according to the traditional principles of res judicata. So I don't think you can get out of us interpreting the settlement agreement simply because under res judicata principles. Well, I just disagree, Your Honor. I think in a situation where the settlement agreement calls for a dismissal with prejudice- That's exactly what the Eleventh Circuit dealt with. Yeah, but my point is that in those cases where the defendant has bargained for a dismissal with prejudice of the claims, the defendant is entitled to the res judicata effect of that dismissal. It still depends on what it is they bargained to have dismissed. I mean, that sort of begs the question as to what they bargained to have dismissed. They bargained to have dismissed the claims that were asserted in that case, and the claims that were asserted- Which were all about NYMEX contracts, right? No, the claims in that case were based on the allegation that the defendants falsely reported to the trade press and that those false reports did two things. According to the cornerstone propane complaint, they affected the underlying price of natural gas on which futures derivatives claims and futures derivatives contracts are based and also affected the marketing of NYMEX contracts, but the underlying- So they rose out of the sand. No one doubts if we were applying- We would say they rose out of the same transactions. You should have made all the claims that you had out of those transactions, and you lost the case, and therefore you're done. So that's not what I'm focusing on. We've said a settlement can limit the scope of a preclusive effect of a dismissal with prejudice by its terms, and so the question is does this settlement agreement limit the effect, not whether or not there would be res judicata from the dismissal with prejudice, but does the settlement agreement limit the effect of the dismissal? No, I don't think it does, Your Honor. But if I could turn then to the release for just a moment. Sure. That's really not what I wanted to talk most about this morning, but the release here, in my view, does cover Sinclair's claims because there was a relationship established in the record between Sinclair's trading in NYMEX contracts and his physical purchases of gas. But does the record make a difference? The language of the release talks about claims arising out of NYMEX, natural gas contracts. It says based on or related to. Arising out or related to. And what you're saying is when you purchase natural gas directly, then your claim is arising out or related to the futures contract. No, that's not what I'm saying here, Your Honor. If the record shows something that's not necessarily in the release, then what are we to choose, the record comments or the release itself? Well, both, Your Honor. Sinclair is arguing that the release doesn't apply to it because it didn't hedge. That's not the way the release reads. The release says that if the claim is related to trading in NYMEX contracts, then the claim is released. So why is the claim? Well, no, why is the claim that's made in this case, which is that I purchased natural gas not pursuant to a NYMEX futures contract but directly from one of the defendants right out of the pipeline, why does that arise out of or relate to? Relate in any way. Relate in any way. That's defined very broadly. Yeah, so tell me why it does. It does because in this case, despite what Sinclair says, its documentation shows that it netted against its price for natural gas for its refineries its gains and losses on its NYMEX trading. That establishes a nexus between trading in NYMEX contracts, buying NYMEX contracts, and the purchase of natural gas. It's an accounting mechanism. Well, it's still a relation. It's still a relation. So if the NYMEX gas— I'll grant you, Your Honor, let me finish on this point because I will grant you that the relation is not the same as what we have in farmland where it's much more clear that what the plaintiff was doing was buying NYMEX contracts in order to hedge its physical purchases. But the class that was established in the NYMEX case isn't limited to people who bought NYMEX contracts for the purpose of hedging. It's defined to include anybody who purchased NYMEX contracts during the relevant time period. Sinclair clearly did so. No doubt. This record is clear. And so what you have to look for is whether there's any kind of relationship. And New York law is very clear on that. Now let me ask my question. Okay. Let's assume that NYMEX gas exploded inside the Sinclair plant. A release? I think so, but I haven't—but I'd like to— No, that's what your argument is. But I'd like to have— Once you've bought a futures contract anywhere, whatever happens in the future doesn't matter. It's all released. That's your argument. Well, there still has to be a relationship between the purchases. Yeah, there still has to be a relationship between the purchase of the NYMEX contract— But see, the argument that you made about the nature of the relationship is that if you have an accounting mechanism over here in your records, everything is related. So if those facts were the same, then wouldn't you be saying that the explosion damages were related as well? That's why I said I think so, Your Honor. I think that it would have— Wouldn't that be a strange interpretation of this release? I don't think it would be a strange interpretation, but it's really, frankly, not one that I'd thought about. Here we have a much more clear relationship between Sinclair's buying NYMEX contracts and its cost for natural gas. On its own books, it's showing that there's a relationship between those two because it nets out those gains and losses against its physical purchase. So if it had made the accounting decision not to do that, would their claim be preserved? It might. This is sort of a strange release that depends on internal decisions made by the releasee with respect to accounting. Well, I'm not sure how to respond to that, Your Honor. Well, I mean, it seems to me that— I'm asking sort of the question Judge Lamel was asking differently. You have a release which on its face might not cover direct purchases, but you're saying it's transformed into one because of the way you account for them. I'm sorry, Your Honor. Assume that on its face the release doesn't cover the transactions in this case, just for the moment. But you're saying even if it doesn't on its face, it does because we know as a matter of fact that Sinclair engaged in certain accounting practices.  under the release between trading and NYMEX contracts and the claim that's being asserted in the case. If I could talk for a moment about res judicata, because I do want to make clear that I think Sinclair has misrepresented that the Hess case says that the identical factual predicate rule applies in res judicata. I simply don't think that's right. So you think the farmland panel is wrong in saying that? Well, wiser counsel than I have— No, I'm just— I have advice. I understand. And it's not presidential. I'm not going to tell you that they were wrong. Well, you are. No, no. What I'm going to tell you is that they simply didn't decide. That panel didn't decide res judicata at all by necessity or by implication. This idea, I mean, the res judicata is not a necessary predicate to the ruling in farmland at all. There's no mention in the district court decisions in this case or in farmland about res judicata. But if you believe that the claims come out of a different transactional nexus, as the panel in farmland did, correctly or incorrectly, it's not presidential. So don't feel timid to criticize them. If you believe that, then that would necessarily doom a res judicata claim, wouldn't it? Well, I'm not sure I'm understanding your question. Sure. If two different claims arrive out of a different transaction, different common nucleus of facts, a judgment in the first case would not be res judicata as to the second. That's basic. If they arrive out of completely different facts, that's right. So what the panel seemed to say is, no, these arise out of different transactions, and therefore the settlement doesn't cover it. They may be wrong. They did that for purposes of the identical factual predicate rule, which is a rule that's been designed to make sure that in a class action settlement, claims that could not have been presented in the case don't get precluded by a release, unless they arise out of the identical factual predicate rule that was at issue in the class case that was settled. That rule doesn't apply to res judicata. If you look at the Hess decision, there's simply nothing in that to indicate that the identical factual rule is part of res judicata. It talks about issue preclusion. You have issue preclusion. It can be over here on identical factual predicate rule and release. Yeah, and there's no issue preclusion in this case because there's a settlement. We all understand that. Counsel, you're using up your colleague's time. If you want to yield. Thank you. May it please the Court, Michael McGill for the e-prime defendants. And I basically want to use the rest of our time to kind of flush out the discussion that the Court has been having. And I think it's important to realize that if you just look at the release, even in light of the farmland decision, it applies on all fours to Sinclair Oil here. They have admitted they were a class member. They admitted that they bought and sold non-mixed contracts. But are the claims that they're asserting in this case, did they arise out of their purchase or sale of natural gas non-mixed contracts? That's the issue. Yeah, and it goes to the colloquy that you had about is this just merely an accounting issue and should they lose their rights because of simply how they accounted. They didn't have a choice to account any way other than the way they did. FASB 113 requires them to look at both of them in conjunction, not just regular. But I'm still stuck with the original question. Put accounting aside and everything else. How did their claims in this case, which is that we bought natural gas directly from your clients, you fixed the price. How did those arise out of their purchase or sale of natural gas contracts? They arise because they tied the price to what was in NYMEX. And as Judge Levelle made reference to part of the definition, in the release, it's not just any and all claim that relates to it. I mean, it is any and all claim or assertion that relates in any way to the NYMEX. And the NYMEX and the direct sales go together. It says, I know A, B, and C all occur under any claim arising from or relating in any way to trading in NYMEX natural gas contracts. And there's a bunch of A, B's and C's after that. So I'm focusing on the very first phrase. Why does the claim in this case arise out of or relate to in any way the trading in NYMEX natural gas contracts? Well, it does because it was done in conjunction with each, number one. Number two, there was a class representative identical to the situation of St. Clair Oil. The court found that it was an adequate representation and that the release also gives up, as Your Honor first said, and the first thing that you said today, was the parties have to be free to pay $100 million and get perspective. Well, there are different rules that apply in the class context because you're precluding people who are not individually present, who don't negotiate for themselves. I have a slightly different question about the wording of the release. In addition to saying arising from or relating in any way to trading in NYMEX natural gas contracts, there is a parenthetical which includes taking or making delivery of physical natural gas pursuant to any NYMEX natural gas contract. And so it seems to me that that is limiting language. That is, if you take delivery of physical natural gas that is not pursuant to a NYMEX natural gas contract, it's not covered. Do you disagree with that? Yes, Your Honor, because going back to the concept of a perspective release, we focus on the release itself. That's what I'm doing. It is for the claims that were or could have been brought in the lawsuit. Right, but it specifies that it involves taking delivery of physical natural gas but only in a narrow circumstance if it's pursuant to one of those contracts. And so that's my concern with your reading of the release. But in the record, it is established that St. Clair did that. But the claims don't arise from that. We don't doubt that. So we're talking about a different kind of damage from the same conduct. Well, but that's the question because this seems to specify that there are only certain kinds of delivery of physical natural gas that are within the scope of the release and other kinds of taking delivery are not within the scope of the release. And I would submit that it is clear that there was at least one class representative who could have made those very claims outside the scope of the release and did not in that lawsuit, and therefore they were released. That's a different claim. That's a res judicata claim. In other words, we're just focusing now on the language of the release. Judge Lamel has a question. So your position, I take it, is that the parenthetical phrase that Judge Graber read to you is surplusage. Because even in the absence of that phrase, all such claims would be released. Far be it for me to say that a lawyer writing a settlement agreement would put in surplusage. But that is your position, right? That the phrase is essentially not necessary. It's not necessary because it was meant to be a prospective release. And under Sinclair Oil's theory, every plaintiff, every potential and actual class member in the NYMEX lawsuit that got $100 million to go away could come back the next day and refile in the same court in front of the same judge asking for relief about their non-contractual sales damages. Remind me, counsel, and I know you have time for that. Yeah, please. You and your co-counsel referred to some things outside of the settlement release that admittedly may be on the record. Did the judge here in the summary judgment context cite these other outside issues in interpreting the effect of the settlement agreement? Like the accounting things that you mentioned? I know it was in the record, Your Honor. I don't know that I can recall the parts of the order, whether it was specifically referred to. But it was certainly before the district court when he made his ruling. Thank you, counsel. Do you have some rebuttal time remaining? Thank you. I'd like to return briefly to Hesse v. Sprint Court. And I think it tells us a couple of things that are pertinent to the discussion we've had this morning. First, the membership of the class, of a party seeking to bring a claim under these circumstances, isn't necessarily determinative. In Hesse, the plaintiff in that case was a member in the prior class action case. And yet the outcome in Hesse was that by virtue of the absence of an identical factual predicate, the claim had not previously been released. The second thing I'd like to point out about Hesse is that look at the language there and its discussion of claim preclusion. And you see that it applies not only to release but also to res judicata. And I think that in this case that we're sort of withdrawing into theoretical semantics, but what Hesse tells us is whether it's release or res judicata, without an identical factual predicate, neither applies. I'd also like to point out with respect to the accounting treatment of the hedging that Sinclair did do, and I think the court is cognizant of the fact that our hedges were done in conjunction with a sulfuric acid recycling contract in which we bore the risk of price fluctuations on the natural gas associated with the recycling of sulfuric acid. And yes, the accounting treatment that was elected reflects that it's being netted out. But the important thing to keep in mind is that will not be a part of the claims asserted, a part of the evidence, a part of the injury that will be asserted in the claims that Sinclair has made against One Oak and E-Prime. It seems to me you raised two separate arguments, and that's why I asked you at the beginning. They're not necessarily the same. And I take your colleagues' position that maybe for res judicata purposes, the same transaction analysis is different than it is for class action settlements. But on one level, what you're saying is this agreement doesn't cover us at all. You read it, our claims don't arise out of the purchase or sale of natural gas contracts. On the second level, you're saying it couldn't have released it even if it meant to because they don't arise out of the same transaction. I think that's correct. Okay. Now, on the second one, don't they arise out of exactly the same? The transaction we're thinking about is not the transaction that you engaged in, but the bad stuff that your opponents did, which is they got together and collaborated to fix prices. So that's what the difficulty of having with the prime would be. And your opponent relies upon the relational argument and following up on what Judge Herbert said to say that that's a claim that arguably was released. I think that, back to Hesse, it recognizes that— It's not your purchase, it's the price fixing. There are going to be superficial similarities, invariably. Well, not superficial. It's exactly the same— You said they got together to manipulate the publication indices, and they did it through conspiracy and winks and nods. Sure. So that's exactly the conduct that was claimed to have led to the damage in the NYMEX cases. I disagree for this reason, Your Honor. Consider the commercial context. The NYMEX is a place where financial derivatives are traded. It's a commodities casino. You can bet long, you can bet short, you can bet high, you can bet low. But your damage occurred in that case because, you allege, the prices were affected by the indices in the publications, no? That is the source of the damage, yes, sir. Okay, and therefore the source of the damage was conduct engaged in by these two companies, which is exactly the same conduct that you're alleging is the source of the damage in the second case, correct? No. What different conduct by the defendants do you allege gave rise to damage in the second case? What we assert is their misreporting resulted in inflated prices that we paid for physical damage. I understand that. And isn't that precisely what the conduct that you allege gave rise to damage in the first case? No, sir. Look at what was alleged in the NYMEX complaint, and you see references to the misreporting that was intended to create volatility and manipulate activity. My question is, what different conduct did you allege in the first case that gave rise to liability? Not different consequences, but different conduct. The conduct is the manner in which the misreporting manifests itself on the one hand in the NYMEX. So your answer to my question is that you didn't allege different conduct in the first case and the second case. You've alleged different outcomes. You've alleged different damages. But you did not allege different conduct. Am I correct? I disagree, Your Honor. The fact that they have misreporting in common doesn't mean it's the same conduct. What other conduct by the defendants gave rise to potential liability in the first case other than the exact same conduct that you're referencing in the second case? The manner in which it was misreported. And all I have to rely on, Your Honor, are the… Misreported to whom? To the publications? Yes, to the publications. And that's exactly what you're… See, I'm not sure it dooms your claim, but I'm having a hard time seeing what different conduct liability is based on in each case. All I have to go on, Your Honor, are the allegations made in the NYMEX complaint. And they describe a contractual context that's radically different. It's the difference between speculating on pork bellies and going to the store and buying a pound of bacon. And it is that conduct, I think, that defines the difference. Let me try this one more time because I'm going to give you an analogy. Okay. You run into my car. You break my car and you hurt me. That same conduct gives rise to two different types of liability, does it not? One for property damage and one for personal injury? I see your point, yes. Is not exactly what we have here, the same conduct in each case, gives rise to two different types of liability? One for the purchase and trading of NYMEX futures and the other for the purchase of natural gas? Two different claims that are arising out of the same set of factors and areas. I think at its heart, there is certainly that overlap, which is misreporting to the reporting services. Right. There's no question about that. In the absence of that misreporting, would you have had a claim in the first case? No, you would not have had a claim. Thank you, counsel. Thank you. The case just argued is submitted, and we appreciate the arguments of all counsel. Our final case on this morning's docket is Arendelle v. Camp Shiro. If you would set the time separately for each counsel, it will work a little better. We'll begin, I believe, with Ms. Bacon, whose name was just taken in vain in a hypothetical, I think. I'm going to have to give you just a moment. Sure. Yes, please, get settled. I'm going to send out some more lawyers. Thank you. Thank you. Thank you. Would you begin whenever you're able? Thank you. I'm just checking with everyone, Your Honor, to make sure it leaves the court. My name is Jennifer Jill Bacon. I'm a lawyer from Kansas City. I'm here representing the Kansas, Missouri, and Colorado class cases in this matter. And I've been representing those classes for the last almost 13 years. I've made two trips to the Ninth Circuit, one to the U.S. Supreme Court, and I'm back here for a third. Maybe we can send you back to Washington again. Thank you. Thank you very much, sir. As you know, this is a nationwide horizontal price-fixing conspiracy, or that's our allegation, accomplished by price manipulation of nationwide retail gas markets. The judge below has denied our class. We are here to talk about that denial. Are there any? I'm sorry. Sir, here's the tough question in this case. Let me pose it at the beginning. Judge Graber can maybe fix it for me. But this is a class-action denial based at least in part on the judge's finding under Rule 23b3 that common questions of law and fact did not predominate. Do you agree we review that finding for abuse of discretion? I believe you would review all the findings for abuse of discretion. The interesting thing here on the standard of review is that we also come up on a 23f, which is a different standard, which suggests the 23f is just what makes the case appealable. In other words, you wouldn't be here in the absence of a 23f. No, no, that's exactly right. It's still my question. Don't we review the judge's finding for abuse of discretion? You do. Tell me how he abused it. I need to interpose the question, if I may. As part of the review of abuse of discretion, do we also review the analysis for errors of law? Because by definition, an error of law is an abuse of discretion. Correct. And Judge Graber anticipates my question, which is that first, you have an error of law here. And if not, do you have an abuse of discretion in the judge's discretionary fact finding? Both. I believe we have both. And let me give you two reasons, two principal reasons. First is that the judge's decision below completely fails to meet the rigorous standard required of a class action certification decision. And I have several reasons for that. I will go through them and I will go through the class action standards. The other thing that I think is important here is the judge's decision below completely fails to recognize the difference between the various state antitrust statutes at issue here. None of them are like the other. And yet every case was decided without separate analysis. In some instances, it's almost impossible for the case to have been decided the way it was if the state statute had been analyzed, if the actual allegations and damages claims to the complaint had been analyzed. While you're discussing that, I also have some concerns about the extent to which the district court's discussion of injury was joined with a discussion of damages because they are different. They are different. And I will discuss that and I will do that right now if you would like. It is not uncommon, frankly, particularly in class action type cases, antitrust cases, for impact and damages to be confused. It happens, I think, more often than not, but it does happen. Impact is simply the fact of injury. Did some injury occur and did it occur to most of the class? There is no requirement that all class members be uninjured. That can be handled at the damages phase. There is no requirement that all class members be injured uniformly during an entire class period. There is no requirement that all class members have purchased gas exactly in the same way. Here, of course, the judge found no impact. And yet he appeared to relate that to the fact that not all injury was uniform across the entire class period. He didn't find no impact. What he found was that the questions of impact were factually not predominant. True. But his rationale for that appeared to be that injury was not proven in a uniform way across the class period. It was up and down during the class period. And the fact that purchasers had different types of contracts. In our case, we controlled for that. Our experts analyzed all the contract types that our class members used. There were five of them. And I've read your expert reports. So let's assume that your experts could present, because that's the way you intend to present your case, your experts would present common questions of law and fact across the class, but that the defenses to the claims would necessarily break down into separate trials. Does that mean that common questions don't predominate? In other words, what if the other side says, okay, thank you for your expert reports. I'm going to bring on each of the people who made these communications with the trade publications, and they're going to testify that they did it completely independently and on their own with no collusion with anybody else. I know Judge Harvey's phrase that is hypothetical, but in this case, do we know what defenses are going to be asserted? Are they going to just use countering experts or something else? Does the record show that? I think the defendants here are challenging every aspect of the case. For instance, they're going to challenge was there a conspiracy, and did they manipulate, and did that cause harm. But each one, if you had an individual trial on those issues, each one of those cases tried by us would present precisely the same testimony. But just in terms of, let's say, the injury aspect, the damage aspect, do you believe the defense as to your experts is going to simply be limited to countering experts or something more on an individualized basis? Our experts have testified to a common methodology. Their experts have criticized that common methodology. But if it's just a battle of experts, it would be an easy... Yeah. I guess what both Judge O'Mell and I are asking, at least what I'm asking is, you concede that the defendants aren't limited to presenting expert testimony in defense. They may bring in every person who communicated with the trade publication to say, this wasn't pursuant to a conspiracy. I didn't do it. I inflated the price on this one because I wanted to make more money for my company. So what's the relevance of the nature of the defense to other common questions of law-of-fact predominance? I don't believe that the nature of the defense matters. I think what matters is that we, the plaintiffs, are presenting a common series of questions. Counselor, doesn't the rule require consideration of both plaintiffs and defense? I believe it requires, I believe our duty and our obligation, our burden, is to show that we've presented common questions of law. We're no longer looking at your burden. That's not our job. Our job is to look at what the district court decided and determine whether his decision is an abuse of discretion after reviewing everything. And so I guess as you're answering these questions, I guess what I'm curious about as I listen to my colleagues and your response is whether if you brought individual claims and not class claims, whether those exact same defenses and witnesses would have to be presented in every case. Because if the claim is collusion and the answer to that is no, everybody reached an independent choice, there was no collusion, wouldn't they have to present the identical witnesses and defenses in every case? Yes, and I thought that was what I said. If I failed to do that, thank you, Your Honor, for saying it better. That's exactly right. Any time we're going to try this case, and as we've pointed out in our superiority arguments in our brief, this is a very difficult case to try individual claims on because many of them are not large enough. But there are a few. There are a few folks who bought enough gas that it would probably be feasible to trial an individual case. But every time we try one, we're going to be trying it on exactly the same evidence. And I think we're not dealing here with a superiority finding, are we? In other words, the judge didn't say it's better. In other words, I could see a district judge saying let's take one of the big ones, let's take three of the big ones and try them first as sort of bellwether cases. But that's not what he said. No, but what he does do as he repeats himself throughout the order, he says the court finds that the predominance and superiority requirements are not met. But as we pointed out in our brief, there was no finding made in his discussion section, which was pretty short, but there was no just finding made of superiority at all. Can I get back to the point you made at the beginning? You said the order was inadequate. Yes. If we agree with you, shouldn't we send it back to the district court and tell him to send us an adequate analysis rather than us make it in the first instance? I understand you've been at this for 13 years, and I understand you probably don't like the district judge's findings. But we're not very well equipped to make those kinds of findings in the first instance. Why shouldn't we, if we agree with you, just simply send it back to the district judge and say, we need more detail? Obviously, that's an option. There's no question about that. The judge didn't appear to have a very clear understanding of what's required to actually look at a class case thoroughly, and so we have some trepidation about that. That does get me to my other point about the various state statutes. One of the issues here is that he made a decision, arguably, in one case, and then just said, okay, everything else is the same. But it can't be so, not if his rationale is as he says it is. The case in Colorado is a case involving a single defendant and the customers of that defendant, and the only remedy in that case is full consideration, which has no issues about individual contracts, no issues about any of the things that he briefly mentions in the opinion he wrote. Those rationales can't possibly apply in the Colorado case, and yet, he says, for the exact same reasons as Kansas. It does demonstrate the real difficulty, and I think any judge, and I'm not trying to spurs judges, but the fact is if you have to make four class decisions on four different statutes, none of which are the same, as we point out in our brief, the Kansas statute, which predates the Sherman Act and looks nothing like it, is essentially a pure price manipulation statute, up, down, sideways, and it says in print, anything that distorts the market doesn't reflect actual prices. Anything is a per se violation of the Kansas antitrust law. It does have to be done collusively, of course. But you couldn't establish damage if the prices were manipulated in a way that favored it. No, no. I do understand. I do understand. But your argument is that's a damage calculation, not a liability calculation? My argument is it's a different standard. The same thing the Kansas case says is that the standard for agreement or collusion in Kansas is different. Now, I guess I'm getting back to the defense issue that we've been talking about. Judge, I think what the district court was saying, and it is terse, is you're going to have to prove that you were actually injured by the various manipulations in different ways, and therefore each class member is going to have to prove that in different ways, and therefore we don't have common questions of law and fact. Am I wrong about what I think you said? No. Here's what I have to say, and I would like to, before I answer that question, note that I'm about out of time, and I wanted some time to reserve, and I'm going to lose it when I answer your question, so I'd like to make that point now before I lose my time. That's life in the big city. I know. I do know that. I know that. I understand. Here's the point about that. You do not have to do that, because our experts are going to put on an aggregate damage theory, and that damage theory accounts for the different dates that damage occurred, the different locations at which it may have occurred, and the different types of contracts, and that is shown in our record where our expert says, Variations in impact across date, location, or contract type are readily and properly accounted for in determining aggregate overcharge, FRE 081. So the experts who understand that differences in contract type may make some difference in your damages. Differences in the time across the class period may make some differences. Differences in location, not so much, but they may create some differences. They have a common methodology of creating an aggregate damage overcharge that accounts for that difference. Thank you. We'll give you a minute for rebuttal on the time. Thank you very much. Mr. Billings? Are you next? I believe I am. So do we. And you have 10 minutes, I believe. I believe 15. I believe the way we agreed to do it was that, or the clerk informed us, is that I'm representing the defense, and I will respond to Ms. Bacon, and then I'll have an opportunity to respond to Mr. Billings after Mr. Billings. That's fine. Okay. Good morning, Your Honors. Ms. Bacon, Mr. Billings, may it please the Court. My name is Trey Fisher. I represent the Dinegy defendants, but I will be presenting this morning on behalf of all of the defendants. I want to begin this morning, in the first instance, to address the last point that Ms. Bacon was making about the aggregate damage argument, and I want to cite specifically to NRA New Motor Vehicles at page 28 of that opinion, and I'm quoting, the ability to calculate aggregate amount of damages, as plaintiffs propose to do here, does not absolve plaintiffs from the duty to prove each class member was harmed by the defendant's practice. The fact that you can accumulate something that is individualized into a big number doesn't absolve the responsibility and the obligation to show that each class member suffered antitrust injury and was harmed. And the judge, in this case, correctly found that you had to do that only with individualized proof, and I want to... I'll defer to Jim Graber. Let me start. I think we may all have similar questions, but it seems to me that there were a couple of ways in which the district court mushed together things that are distinct. One I mentioned earlier is that the same paragraph seemed to discuss injury and damages as if they were interchangeable, and for purposes of class certification, they're not normally interchangeable. Secondly, there is not a separate explanation with respect to superiority, which he seems to conflate with predominance, and that's aside from the issue about whether each state should be analyzed fully in a separate manner. And so I just have some concerns about the adequacy of the legal analysis only apart from whether it reached the right result. So could you address that? You may be better at this than the district judge did. You're giving us lots of good reasons why the district judge might have done what he did, but did he say that? He has only a paragraph here. Well, Your Honor, one thing I think to stay focused on in this instance is that the task before the court today is whether the decision, the decision itself denying class certification, was that an abuse of discretion. And it was if his legal analysis is wrong. Yes, Your Honor. I fully understand, and I want to address that. But the plaintiffs want to speak a lot about the order and complaints about whether he spoke enough words, used enough paragraphs, rather than actually embracing the actual decision and addressing that. If the decision had just said, I deny class certification because I think common questions of law, in fact, don't predominate, and then you could come up here and say to us quite reasonably, let me demonstrate to you how they don't, would we then affirm? I think in that instance, Your Honor, the case law would say that the standard of review at that point may be different. You may lose the abuse of discretion standard, and that's what Las Vegas Sands, for example, speaks to that issue. But in this instance, also quoting the Las Vegas Sands case, if the trial judge has made findings as to the provisions of the rule, which are present in our order, and their application to the case, his determination of class status should be considered within his discretion. Could you go back and answer my question, though? Doesn't he conflate things that are separate and not discuss them analytically separately? Injury plus damages on the one hand, superiority and predominance on the other, and mushing all the states together. Cumulatively, that seems to me to be an inadequate analysis. With respect to injury and damages, I do believe that the judge dealt with them distinctly. While he may have discussed them in the same paragraph, I think he's careful to address harm, which he was describing in my view as injury, and damages, and speaking to, for example, that plaintiffs' own experts have used different methods to calculate injury, resulting in disparate estimations of what percentage of class members were even harmed. He's speaking of antitrust injury, the liability element. He addresses damages as well, because we have no class-wide method of determining damages. And there are a few points I want to give you. We gloss over this at a pretty high level in terms of what this market is, because there's not one market at issue. We have multiple markets with multiple transactions and an utter failure to analyze any named plaintiff's contracts. And there are some important consequences to that. But to the point about superiority and predominance, I want to get back to that. Those often merge, because if you don't have a predominating common issue, such that Rule 23b-3 is satisfied, then class-action treatment is not superior. It's unmanageable. Likewise, if it's unmanageable, it's usually unmanageable because individual issues are predominating. So those two requirements, in many analyses, do work together. I tend to agree with that. Here's the difficulty. The only substantive discussion in the predominant section, which, as you say, tends to merge with the superiority one, I'm looking at the record on page 26. 26 of 35 of the judge's opinions are 1, 2, 3, the last five sentences of the paragraph, because the rest of it is just quotation of case law. As counsel for defendants in order to hear inquest, members of these actions are not small consumers whose damages constitute a straightforward calculation of units or products purchased. That's a damages calculation, right? Yes, Your Honor. It is a damages calculation. And under Doyle and Comcast, you have to have a class-wide methodology for determining damages. That's not an individual calculation. Right, right. It's a class-wide methodology. But this is a notion that it's not common questions or law of fact don't predominate because we may have to calculate the damages for each individual plaintiff differently. And I think that should be the misstatement of law, doesn't it? No, Your Honor, it's not. What I believe that the Court is saying at this spot is because they are not small consumers, I mean, if you look at a wage and hour case where you have, you know, very simple to use the defendant's records, like, for example, in LABA, where you've already had the defendant making the calculation, and you're simply a number of hours that you weren't paid for times your hourly rate. Or there are small consumers where it's a straightforward. There is a class-wide methodology there. What he's pointing out is that these models that have been presented do not present a class-wide methodology. But initially there are 16 models. That's a damages issue, not a liability issue, isn't it? It is a damages issue, and you have no class-wide methodology for calculating damages. Individual issues will predominate. Well, not necessarily. Not necessarily. I mean, what is your response? I have two things I'd like you to respond to in your opposing counsel's argument. The first is the assertion that the liability evidence would be identical if these cases are tried separately. That is, the plaintiff's case showing collusion, manipulation of prices, and the defense showing, no, no, I came to this independently. I didn't collude with anybody. Wouldn't all that be the same? No, Your Honor, it would not. Because the actual allegation here is they talk about this common scheme of pricing, but when you actually read their expert reports, their expert Mr. Donkin, he doesn't speak of an agreement. He doesn't speak of a common purpose. He speaks instead of uncoordinated, self-interested behavior. This Court addressed in Gallo these false reporting decisions. With respect, isn't that a merits argument? In other words, you might win on summary judgment. They may not be able to establish their case. But their case seems, as Judge Graper suggests, would seem to be exactly the same as to each defendant, and your defenses would seem to be the same. We're talking about an allegation of conspiracy, collusion to affect the price of natural gas, correct? That is the allegation. So wait, wait, let me follow up with that. And we're talking about this type of commodity. We're talking about specific claims of what this collusion or conspiracy involved. I don't see a difference in what you're saying in the presentation of the proof in that regards, other than the identity of who's involved in the conspiracy, I think is what you're raising, that, oh, my client really didn't do that. Well, again, that goes to what Judge Hurwitz mentioned. Well, that's a merits-based type argument to me. I would respectfully disagree. And the analogy I would draw is to the Walmart v. Dukes case, where the court there determined that because in that instance there were thousands of employment decisions being alleged and challenged across the country, different stores, different regions. We have the same thing here. There's not one price of natural gas. The allegations in that case were considerably different than they are here. The allegation there was that the problem was that there was subjective permission for every manager to act differently. That was the very essence of the Walmart case. And so that just seems like 180 degrees opposite here, where they're saying, you know, these 11 people got together and made a conspiratorial decision. That isn't open-ended at all. But the other piece of argument I'd like you to respond to is the issue about state-by-state, that the analysis, for example, for Colorado is not the same as the analysis for other states. And it is quite clear from the judge's order that he didn't analyze but once. He had one paragraph about this, and then he said, for the same reason in each of the other motions. So should he have analyzed each state's class action differently? Yes, Your Honor. If I may answer your first question first with respect to, yes, as this court acknowledged in Gallo, these decisions about the false reporting were left to the individual traders. As their expert, Mr. Duncan, acknowledges and is very clear on, in the same way that in that instance in Walmart you had all these individual decisions, you have all these individual, unilateral, self-interested decisions, whether to false report or not. And again, the point I have is when they- Well, but that's not their allegation. Their allegation is that while each of the traders may have made an individual decision about what to report, their decisions were made pursuant to an overarching conspiracy. Now, they may not be able to prove it. I'm not sure I find their expert report on it very convincing. But that's not the issue in front of us. The issue in front of us is that as opposed to Walmart, where nobody thought, nobody alleged there was a national conspiracy to discriminate, the argument was there was a- There was a common policy that allowed discrimination. But the policy was of individual decision-making. So that's a very different allegation. I would just respectfully submit the allegation here is actually about individual decision-making. And the point I haven't been able to make very well, and I apologize, is that there are 39 different locations or 39 different indexes that are at issue in this case. And their experts, when they're establishing or trying to show impact to those, they change every single month. Every single month at each location is different. And so back to the question of why he didn't analyze each state, each one of those states follows the Sherman Act. Each one of those states requires proof of impact, proof of injury as a liability predicate. He determined correctly that individual issues of impact will predominate. And another thing that I think is remarkable here, we actually don't have any evidence, any analysis of the named plaintiffs' own contracts to show whether they have antitrust injury. And if you would bear with me, I can give you an example of why it matters that there are 39 different locations that vary every month and that there are no analysis of the actual named plaintiffs. And that specific example is to use Colorado again. Breckenridge is the named plaintiff there. There's also a named plaintiff BBD acquisition that bought gas in the same way, so I'll just refer to them as Breckenridge. And the record at 396 and 400, they had a contract where they were buying monthly index gas plus 50 cents at a specific location in Colorado, Rocky Mountain CIG. And so from September 2001 to the end of the class period, then I would direct you to Dr. Harris's results about impact, which he summarizes. We will copy this to page 39 of our brief. It's Exhibit 7 to his report, and it's in the supplemental record at 21. From September 2001 to the end of the class period, he only finds impact for two months, in November of 2001 and February of 2002. And when he does, it's 1%, 1% of customers. And so you ask yourself the question of, well, does that include Breckenridge? Well, it probably doesn't statistically, but we don't need to answer it that way. We can then go to one of his other exhibits where he is summarizing his results by location by month. That's in the record at FRE 4 to 5. And if you look between November 2001 and in February 2002, where he says there was 1% of customers impacted, Rocky Mountain CIG is not listed. And you can then go to another of his exhibits at FRE 129 to 132, where he's listing the class members that he claims were impacted. And we don't find Breckenridge on that list. We find Ford Motor Company, we find Anheuser-Busch, other very large companies. What you're making is a typicality argument, though, right now, and not a predominance argument. Because you're saying that the class plaintiff isn't typical of those who were injured, but that isn't what the district court held. What I'm trying to illustrate, Your Honor, is a predominance issue, because going through that analysis, which I just did, at the end of results of that, Breckenridge, the named plaintiff in Colorado, is not impacted. They do not have Article III standing based on their own experts taking it at face value. But the important predominance point— What the district court said, though. The important predominance point, if I may finish, Your Honor, is that going through that analysis, which they haven't done, but going through that analysis for a simple case like Breckenridge will do absolutely nothing to prove the claim of any other class member who bought natural gas at any other location or in any other way or at any other time, even if they had shown impact. And it doesn't—back to the Wal-Mart case—it doesn't show injury in one stroke. And that's why individualized issues predominate, because it matters where you bought gas. It matters when you bought gas, because they couldn't find consistent impact consistently through the class period. And, you know, if you look again at Dr. Harris's Exhibit 7, page 39 of our brief, it's self-evident. He's got zero—they all conflict. And it's not worth saying that the answer— Let me try to rephrase your argument a little bit and see if I've misstated it. What you're saying is that because different indices and different contracts determine whether or not an individual defendant was injured, in addition to presenting their expert testimony about class— about impact on the class as a whole, they would have to show that each individual defendant suffered some damage. An individual plaintiff. Plaintiff, I'm sorry. Yes, absolutely. And that's what—that's the quote— Why doesn't that—I mean, I understand the point. I'm trying to figure out where the dividing line between damage and impact is in these cases. In other words, couldn't there be a requirement at the damage stage that you demonstrate that you were one of the people who fell into the proof submitted by these folks? I'm not sure I fully understand your question, but the antitrust impact is fact of injury. You have to establish that you were injured. In this case, doing that for every class member will involve an individualized inquiry by the nature of the market, by the number of the markets that are issued, and the way they have chosen to analyze it with six different— So let me ask the question differently. Could you have a class action which focused on whether or not there was an antitrust conspiracy that affected prices of natural gas purchasers? And you'd try that issue, and you'd find out whether or not there was or wasn't. If there was one, could you then have follow-on individual actions by individuals trying to demonstrate their particular damage? Well, I think the answer to your question is in your reference to affected everyone. To show that in this case, the affect everyone is individualized, and therefore you couldn't have that class. It sounds like you would never have done a class action on the antitrust case is what you're saying. No, Your Honor. I think there are a number of antitrust cases that are suitable for class treatment where you have a concentrated market, you have an oligopoly, you have two or three sellers. They actually get together. They actually make an agreement. They have a common goal and a common purpose, which doesn't exist here. This involves the entire market. But when you have a small—and everybody's buying off the same price list, which is completely not the case here. There are many cases like that that you can certify, particularly if then your damage calculation is class-wide, and it's simply overcharged by what you paid. Going back to what Judge Graber asked you, are you arguing a predominance issue or is it something else like difficulty? I guess I'm a little bit—I'm trying to understand your position here concerning the predominance versus the other class action factors that we have to consider under Rule 23. I'll just say, Your Honor, I think that it is principally predominance. There are other problems. Because there's not a predominating common issue, common issues do not predominate. It's not superior. It's not manageable to try the cases. The plaintiffs aren't typical. Thank you, counsel. I think we understand your position and you've exceeded your time. Thank you, Your Honor. You may have some rebuttal time. Ms. Bacon. Thank you, folks. I have just a few things to say. First on the Breckenridge issue, we were not provided any evidence in discovery about the class purchases. We had nothing. We got that about three or four months after discovery closed. It was too late for the experts to use it. And, in fact, the experts here are—we actually told them, because we only had a full consideration overcharge theory, that they did not need to include Breckenridge in their calculations for purposes of damages. They are included in our class declarations, and our experts say they found impact for Breckenridge. Remember, only, as several cases say, you don't have to have impact throughout the class period. One single overcharge is enough. It is enough, but here is my primary difficulty with your side of the case. It is certainly possible for a district court in this exact situation to have certified a class, but that isn't the question in front of us. If it could go either way, we have to uphold what the district court did. If it can go either way, it's not an abuse of discretion. And so a lot of your argument has demonstrated, to me at least, that it would have been permissible for the district court to go the other way, and I agree with that, but I don't know how far that gets us. I think, Claire, you have a horizontal price-fixing conspiracy, proven with common evidence across all of these classes. And remember, our experts, they complain they didn't find impact in every one. Let's assume your experts are absolutely correct. We're not fighting about that. The question Judge Graber and I, I think, and all three of us are worried about, is that could the district judge have rationally found that in these cases, because for all the reasons Mr. Fisher says, that common questions of law, in fact, do not predominate, because with respect to establishing liability to class members, the questions are quite different. No, I don't think that's true. I think commonality, typicality, and superiority are, I don't want to say easy, but I do think they are not terribly difficult questions to decide that a class is a superior, common, typical, those things. With respect to impact, and we're really talking about impact, there is a class-wide common methodology for determining impact. And our experts found impact to every class member they looked at, and understand they looked at about 1,400. They found impact to all of them. I don't deny that there may be somebody out there who isn't impacted, but they found it with respect to 1,400. That's a pretty good-sized sample in anybody's statistical world. They have an overarching damages theory, and one that aggregates damages and takes into account those things that we understand vary somewhat throughout the class period. Was every contract type impacted at the same time? No. Is that unusual? No. Did damages occur at the exact same time for everybody? No. Is that unusual? No. What may be unusual is the ability of these experts to control for that and to take that into account. You have exceeded the time allotted by quite a bit, and both sides have done so. You may have a sentence to sum up. A remedy other than you certify a class if you don't want to do that. Send this case back to the district court with instructions to issue suggestions of remand. The question of class certification is not a common question to be resolved by a single court here because of the state statutes. It is all the discoveries complete. Everything is done in these cases. Send them back to their individual states that they came from. Send them back to the states that are familiar with the state statutes. Had these cases not been JPML'd, they would have been decided in their individual cases. Thank you. Thank you. We will now hear the companion matter. Mr. Billings, finally. Hey, police, the court. My name is Ryan Billings from Korman and Kalis. We represent the Wisconsin appellants. I'm going to try to reserve about two minutes for rebuttal. I agree with Ms. Bacon that class treatment here is appropriate and superior to any possible alternative, but I'd like to start with an issue that the district court totally overlooked and is not substantively mentioned in defendant's brief, and that's the full consideration remedy in Wisconsin. This remedy is very different from the treble damages Sherman Act type claim, which is a separate cause of action. The full consideration cause of action is a disgorgement remedy designed on the principle that one who participates in anti-competitive conduct concerning a product should not be able to retain any of the funds it receives from sale of that product, not even one penny. It's been Wisconsin's statutory law for 100 years and on the common law before that. The elements are very simple. Number one, did the defendants combine or collude to restrain trade with respect to natural gas? Two, in connection with that combination or conspiracy, did they sell gas to class members? Three, did class members pay money for that gas or provide any other benefit? These will be proven commonly. The conspiracy is going to be proven by looking at what defendants did. The sales to plaintiffs can be proven through their sales records. The only individual proof that might possibly be needed are some invoices from the class members, but that's the kind of proof that's necessary in every class action. This cause of action was not considered by the district court, and the defendants don't mention it in their brief. So should we ask the district court to consider it? Well, I think if the court is remanding with instructions, that would be one of the instructions. Well, I mean, your complaint is that the district court didn't analyze your claim separately. So my question is do you want us to do it in the first instance or do you want the district court to do it? Well, we believe it's appropriate for this court to do it in the first instance. Really? To certify a class? You did it in the Levia case, and there were the same errors in that case. The court conflated, said there was no predominance because of damages, and it said there was no superiority but didn't analyze all the evidence. Yeah, but you're making a different argument. So your argument is even if all my friends lose, I win, right? Well, there's more than one consideration. That's your argument. Your argument is we're different. We're from Wisconsin. We are different. We're better than those folks. And so I'm focusing on that argument. Okay. And so now I'm not worried about what a bad job the judge did on the other cases. I'm worried about the fact that he didn't discuss your case separately. Is there any precedent for us just certifying a class under those circumstances? Shouldn't we send it back to the district judge if we're right? Well, I think there is precedent in the Levia case, in the Rodriguez case. That's where we found the judge's discussion wrong, and we could combine it and say, well, that's a great class action because of the findings the judge made. But here you say he hasn't even treated our case. I think he'd be pretty happy with a remand. I'm not asking that. I'm just asking why it isn't the first instance we should make those determinations. Well, because I think the record is developed. I think there's no argument against it raised by the defendants, so it's waived on appeal. And it's very simple. I mean, it's a very simple claim. Did defendants conspire? Did they sell gas to class members? Did class members pay money? All of that's common. It's very, very simple. There's none of this complexity. In our court, in this instance, where you yourself claim that he did not even consider your positions here. That's correct. Be the first instance, a better instance, to review those claims? Well, this record doesn't show that that review was done. You're asking us to basically make some factual determinations and legal determinations here that, you know, the district court, as you say, did not even look at or make. Well, as Judge Hurwitz pointed out, remand is an option. It's up to this court what you want to do. My point is just that the record is developed. It's before you. Judicial economy would be served by addressing this issue, which, again, the defendants don't contest in their brief that full consideration is a good candidate for class certification. There's nothing on the other side. We think it's a no-brainer. Of course, if you want the district court to look at that issue, you can remand with instructions. We just believe it's appropriate on this record to remand with instructions to certify. I appreciate your strategic suggestions. Thank you. With respect to the treble damages claim, I just want to make a couple of points. The first is on the abuse of discretion standard about which the court asked some questions. The Jimenez case that we cite in page 38 of our brief says that if the district court's determinations don't have support in the record, that's an abuse of discretion. The district court cites absolutely nothing in the record on any of its findings in contention. It misstates what the plaintiff's experts found, and it states the FC Dixit of defense counsel. What the record actually found on 1431 is that all or nearly all class members were impacted, that in general we're talking about a market in which gas is homogenous, fungible, cheap to transport, and sold at highly liquid markets all over the country. It's a completely standardized product. It was purchased by class members who were largely small purchasers, purchasing about $10,000 a year of gas, who didn't have the exposure to hire even a single employee to look at it full time. These are relatively unsophisticated class members. That's at 1387 to 98 and 712 to 715. I don't understand your treble damages claim. You get treble damages under Wisconsin law when? There are two separate claims. We can plead and argue both, and what happens is – Just tell me what the two – what are the predicates for treble damages under Wisconsin law? It's a Sherman Act claim. You have to show a combination or a conspiracy or a straight trade. Here you have to show impact and damage. Okay, so then you're outside your disgorgement theory, are you not? That's a totally separate cause of action, yes, totally outside. So with respect to that treble damages claim, aren't you really the same as your other compatriots? Well, it's the same model. Right, so, I mean, it's the same. Your proof would be precisely the same. You have a slightly different version of the argument about abuse of discretion for failure to properly analyze or to cite to the record. Right. And I also think one of the things we pointed out in our brief is that Wisconsin is a little bit different in that there are few market players. We talk about Casdex and WPS and how they serve. These two companies serve more than 50 percent of the market. And so I think it's a little bit simpler in Wisconsin. There are factual differences. Again, there's nothing in the record to say one or the other. But my point is that there's nothing, there's no basis in the record that this court can point to in the district court's opinion to defer to. And the opinion, as my colleague pointed out, is contradictory. With respect to the collusion, I think Judge Graber's point is exactly right, that every trial will have the same conspiracy case. They'll have the same witnesses. They'll make the same arguments. And Judge Hurwitz asked, well, couldn't you win on summary judgment? They put these issues in front of the district court on summary judgment, and they lost. The district court ruled that our conspiracy theory is viable and supported by sufficient evidence that a reasonable jury could return a break in our favor. Would the defense be different in each case? It would not. In terms of conspiracy, absolutely not. Now, Mr. Fisher will argue that this was just isolated actors acting without coordination, and he miscites our expert, Duncan. What Mr. Duncan actually said is that 284 to 289. But if that's true, if it's just isolated people making isolated decisions, then there's no conspiracy, and everybody loses. That's what the court pointed out in the Amgen case, that there's a fatal dissimilarity. Then it's still appropriate for class treatment because it ends the case in one stroke. If we can't prove that by false reporting, wash trading, and churning, these defendants manipulated the retail natural gas market, none of these questions about impact or damages are even relevant. But if we can prove that, the model that Dr. Harris and Dr. Guire put together, it measures exactly this. What was the impact on the natural gas market of false reporting, wash trading, and churning? One of the things Dr. Guire points out is that all of these different measures of price types are interrelated. It's because you've got a completely homogenized product that is sold all over the country in liquid markets. So you would expect that any marker, any price marker for natural gas is going to run on the other ones, otherwise there's arbitrage possibilities. Can I ask you one question about the final suggestion that your colleague made? Do we have the power in a multidistrict case to remand them to the original judges? Or does the multidistrict panel have to do that? What this court has the power to do is to remand to the district court with instructions to file a suggestion of remand, which the judicial panel would consider. Which the district court would then suggest to the multidistrict panel. Right. We don't have the power ourselves to remand to the... No, all you can do is instruct... Several of the original cases were remanded as I understand it. Is that not true? No, several of the cases were settled. No case has been remanded for trial from our NDL. Okay. There might have been some very early in California. Yeah, I thought there were some. I may be mistaken about that. The ones that have been part of the case since 2006, the California case is all settled. But the ones that have been around since then are the four class cases and the three individual cases, the two Sinclair actions and the Farmland action. And those have not yet been remanded. One more question for you. Do you have proof that segregates the impact to the Wisconsin market? Absolutely. Dr. Harrison put together the work of Dr. Dwyer and his own and said what the damages were only in Wisconsin. And he did that by measuring class number purchases in Wisconsin. By looking at dependence on data and showing where they delivered the gas to. We have a damages model that applies only to Wisconsin. Thank you, counsel. We'll give you a minute for rebuttal when the time comes. Thank you. Mr. Fisher? As you're coming up, I'm interested also in your response to the suggestion about remand and whether that's appropriate to suggest in these cases. I do not believe it is, Your Honor. And proof of that, Mr. Billings referenced it but very, very obliquely, and it's the same model. The idea that Wisconsin or Kansas or any of these states should have been analyzed separately is belied by the fact that what they presented were identical motions with identical expert reports that each are based on a larger model that doesn't speciate between the different states. All of the proof that was presented to the district court was exactly the same. And the model, as Mr. Billings referenced. But there are state claims that differ from state to state. The full consideration claim is something I do want to address because full consideration Did you waive that argument by not addressing it? No, Your Honor. I do not believe we did because what I was about to say is full consideration is a remedy in both Colorado and Wisconsin. It is a remedy for a violation, for example, in Wisconsin for violating Section 13303 and to establish the liability under that statute for which you may have a choice of a full consideration remedy, you have to establish antitrust impact. The Wisconsin Supreme Court has been very clear about that. And so when the court here discusses that individualized issues predominate, he's also addressing the full consideration claim. And when we address that individualized issues predominate, there's no need to go further and pile on to that point. But there is an issue in Wisconsin with respect to this court's holding previously that in order to have that remedy, you have to be a direct purchaser from the defendant in order to void that contract and get your disgorgement. But in this case, it's undisputed that all of the Wisconsin plaintiffs except one bought through intermediaries. And they argue that those intermediaries were their agents. But we dispute that. We're entitled to dispute that. And the proof of that will be individualized because by definition, and I can cite some Wisconsin cases, the issue of whether they're actually their agent depends on the understanding between the principal and the agent in order to establish. But what you're saying now, I do not recall from your briefing, your description about Wisconsin law and the difference between agency and not agency. Did you brief that? Yes, Your Honor, I did. I believe it's in a footnote earlier in our brief. I can't recall right now. That's fair enough. I may not remember. Assuming you preserved it in your briefing, I've got a separate question. This is all something the district judge might have found, but he didn't. He just said, look back at my previous order in the first case. It applies to everything. Is that sufficient discussion? I believe it's sufficient because we all understood what the issue was. It was a Rule 23B predominance issue. And this court, at this point, was addressing 30-something motions. And at a certain point, it becomes piling on when you keep going issue to issue. And I don't think the district court had either. There's no requirement, I believe the Berger case addresses this, that says that he has to make any findings at all. And this court can certainly affirm on any ground supported in the record. And I don't believe he abused his discretion. And I want to discuss one thing about these models that they keep touting is that, as Comcast instructs, if your model doesn't even attempt to tie the conspiracy to what you're measuring, you don't satisfy Rule 23B-3. And if Dr. Bateman, did you do anything to isolate conspiratorial conduct in your model? No. That's in SER 232. Harris and Dwyer are the same. Dr. Harris is at SER 540. Dr. Dwyer is at 709-10. And SER 293-984. They fail Comcast out of the gate. They take some data, and they manipulate it, and they claim to have shown impact, but they haven't isolated to the conspiracy as they're required to do. And I would like to give a few more examples because I think it does matter. So when I was speaking, for example, of Breckenridge not proving the claim of any other class member, take, for example, Learjet. Learjet basically had bought its price through a type not analyzed at all. They're buying gas from Kiesco, an intermediary, that's being based on their current cash flow considerations. This is at 317-18 and SER 587-88. But importantly, Kiesco, who was actually selling them the gas, testified that the index price probably had no effect on the prices charged to its customers. And that's at SER 321. So no analysis of Learjet, no showing that it fits into any of the models. It demonstrably doesn't, and you have evidence in the record that they weren't impacted. You can go to other examples. I'm still going to make sure I understand your argument, and I think it's the same one that I asked you about before. Your argument is that in defending the merits of these claims, we would necessarily have different defenses with respect to different class members, right? That's part of it. But I think in discharging their affirmative burden to establish antitrust liability, which is to show injury, that each plaintiff is going to have to put on different evidence. They will not prove the claim to anyone else. But how would you test the judgment in the summary judgment ruling, then, that the model was sufficient to establish, if believed, antitrust liability? I don't believe that was the ruling at all. We moved for summary judgment on the idea that having uncoordinated behavior can't establish liability. The judge said this is good enough for summary judgment to show. The judge focused on wash trading allegations, which, frankly, we had not focused much on in our argument and in our briefing and in the record that we presented to him. And he said that presents an issue of fact. This case is about false reporting. It's not about wash trading. Dr. Breuer, who purports to analyze wash trading. The wash trading and the other individual collusive acts, or bilateral acts, if you will, that may not be collusive, may support their other evidence of collusive conduct. And the judge said there was a fact issue. He didn't grant them summary judgment. No, no, I understand. He said there was a fact issue. But what you're saying is the way we would defend these cases, I mean, we either moved for judgment on the pleading. Judgment is a matter of law because they hadn't proved it. Or we would put on, if forced to defend, we would put on lots of individual proof of absence of impact. We certainly would do that. But I think, Your Honor, the point I'm not making very well is in the first instance. I understand you don't think they can meet their burden of establishing liability without establishing class member by class member impact. No, no. Well, their Rule 23 burden, I agree. I'm not speaking to the merits of whether they were ultimately established. I'm saying the evidence that each class member will have to put on in order to establish that they have fact of injury will be different for each one of them. And if you look at even the ones who want to use Dr. Harris, they will do nothing to prove anything Dr. Dwyer is analyzing. Those conflict. Here's my problem with that. I think, as I understand your opponents, they're saying we don't intend to do that. We're going to put on our models. We're going to live or die with them. So their proof is not going to break down into different types of proof. It may not be sufficient. You might be able to win on JM a while after they put on their proof. But they're not saying we intend to bring in each class member to prove impact. They're saying, for better or worse, we're going to throw these experts on the stand and make our case. Those are common questions of law of fact that we intend to present. You may say at the end of that proof, Judge, we win because nobody has shown individual impact, and the judge may say yes or no. But it doesn't mean that their cases are going to break down into that. They've already told you they're not. They're not going to present that. They do say that. But if you look, even, again, back at their experts. They may be required to, but they're not going to. You're telling me they're required to, but they're saying we're not going to. Well, in other words, I mean, you're right. They're not going to. They haven't even presented evidence to this Court that any named plaintiff satisfies any requirement of Rule 23. But that's not a predominance of law of fact question. They intend to present a single model in each of the cases to say this is why we win. They may lose under that model, but on the plaintiff's side of the case, I have a hard time seeing why the questions of law of fact don't predominate. I can see why on the defense side they don't. We're going to argue that some of these people weren't impacted and some of them were in different ways. Understand that. And it may be that we're saying the same thing but coming at it from a little bit different perspectives, and whether it's what they put on, but we're certainly entitled to challenge it. And when they don't have one model, they have six different models. Those models don't apply to the class as a whole, and we use the examples of the named plaintiffs to demonstrate that, and I do think it's fatal. And it is a predominance issue because it's an example of why individualized issues will predominate, whether characterized as a burden of proof or a defense to whether the burden of proof has been met. When you have sophisticated, and I completely disagree this is a negative value case, when you have very large consumers who have intentionally opted out of any common method of buying gas. Ford Motor Company does not have a negative value case if they were impacted by this. These cases will get tried. It's individual cases, and if these large companies, ironically Tyson Foods is a class member. If they feel like they have been impacted, they are fully equipped to cross-use their claim individually. So whether it's done as a superiority analysis, but we have these industrial and commercial end users who went through great effort to establish natural gas purchasing strategies that were customized and individually negotiated from their perspective and intentionally opting out of any common way trying to be crammed into the round hole of class certification. And that's why at bottom individualized issues predominate. And again, this court can affirm on any ground supported in the record, and I believe the district court's findings on this regard and his analysis, while perhaps concise, is more than sufficient to us to understand the problems that he found. Thank you, counsel. Thank you, Your Honor. Mr. Relance, you have one minute. First, I need to challenge the claim that they briefed full consideration. They absolutely did not. You can look at footnote 4 of their statement of the case, not their argument section, where they make an oblique reference to full consideration having agency issues. They don't say if they're common or not common. They're absolutely common, as we put in the evidence, FRE 145-149, 189-190, 1401, and 1412. They were two ages, just two in Wisconsin, and they both operated on the same model. They would approach customers and say, let us buy your gas for you. Let us go out in the marketplace and get gas and bring it to you. And they did the exact same way for all their customers. Second of all, the full consideration claim is a separate cause of action. It's count one of our complaint. The Supreme Court has never held in Wisconsin that you must probe impact for full consideration. We don't have a Comcast issue because, as I said, our liability case is false reporting, lost trading, and churning, which is exactly what our experts measured. And what their real complaint is is they don't like the way the model is put together. They think it's not representative or it's not perfect. But what Tyson tells us is that's not a class or individual issue. The individuals are going to be presenting that case at trial. All we're asking is because they can present it, the class can present it, that's what Tyson tells us, and we'd like to not leave anyone behind. Thank you. Thank you, counsel. The cases just argued are submitted. We appreciate very much the hard work and arguments of all counsel. And we are adjourned for this morning's session.
judges: Graber, Hurwitz, Lemelle